UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Care Environmental Corp.,

                        Plaintiff,                    CV-05-1600 (CPS)

        - against -                                   MEMORANDUM
                                                      OPINION AND ORDER

M2 Technologies, Inc., Dragon
Chemical Corporation, Burlington
Bio-Medical Corporation,
CMB Additives, LLC, Frank Monteleone,
Dominick Sartorio and Roger Brown

                        Defendant.

-----------------------------------------X

SIFTON, Senior Judge.

        Plaintiff, Care Environmental Corporation ("Care"), invokes

this Court's diversity jurisdiction[1] to bring this action against

---

[1] Although no party has raised the issue, a federal court is required to
*sua sponte* dismiss a complaint that does not properly plead subject matter
jurisdiction.  *E.g., Held v. Held*, 137 F.3d 998 (7th Cir. 1998).  Because
the claims for relief alleged in the complaint are creatures of state law,
jurisdiction is allegedly founded on diversity of citizenship.  *See* 28 U.S.C.
§ 1332.  Federal Rule of Civil Procedure 8(a)(1) requires a plaintiff to
allege in the complaint "a short and plain statement of the grounds upon which
the court's jurisdiction depends."  For purposes of diversity jurisdiction,
this requires alleging the states of citizenship of all parties.  *Held*, 137
F.3d at 1000.  While the plaintiff has properly alleged the corporate
citizenships, the plaintiff has merely alleged the individual defendants'
places of *residency*.
        Allegations concerning a party's place of residence are insufficient to
establish diversity of citizenship because a person may be a resident of one
state but a citizen of another.  *Held*, 137 F.3d at 1000; *Nadler v. Am. Motor
Sales Corp.*, 764 F.2d 409, 412-13 (5th Cir. 1985); *Kaiser v. Loomis*, 391 F.2d
1007 (6th Cir. 1968); *Automotive Fin. Corp. v. Automax of Northern Il.*, 194 F.
Supp. 2d 796 (N.D. Ill. 2002); *Edick v. Poznanski*, 6 F. Supp. 2d 666, 669
(W.D. Mich. 1998); *Brower v. Franklin Nat'l Bank*, 311 F. Supp. 675, 676
(S.D.N.Y. 1970).  This is so because "citizenship" for purposes of the
diversity statute is synonymous with "domicile," not residence.  *Kaiser*, 391
F.2d at 1009.
        In order to settle the diversity issue the plaintiff is directed to
submit an affidavit attesting to the individual defendant's *citizenship* within
thirty (30) days of the date of this decision. If no such affidavit is
submitted then the complaint will be dismissed as to the individual
defendants.

M2 Technologies Inc., ("M2"), Dragon Chemical Corporation
("Dragon"), Burlington Bio-medical Corporation ("Burlington")
(collectively the "corporate defendants"), against Frank
Monteleone, Dominick Sartorio and Roger Brown (collectively the
"individual defendants") and against CMB Additives, LLC ("CMB").
Plaintiff's amended complaint alleges fourteen claims for relief
against defendants, both individually and collectively. The first
claim seeks a declaratory judgment pursuant to 28 U.S.C. §2202 *et
seq.* against the corporate defendants declaring that plaintiff
has no further obligation with respect to the removal of
hazardous waste, and a preliminary injunction compelling
corporate defendants to take possession of, and dispose of, the
hazardous waste. Claims two through seven seek judgment against
the corporate defendants for fraudulent misrepresentation (count
two), breach of contract (count three), services sold and
delivered (count four), quantum meruit (count five), book account
(count six), and account stated (count seven). The eighth claim
for relief alleges common law fraud against the corporate
defendants and the individual defendants. Claims nine through
eleven seek recovery against the individual and corporate
defendants under New York Debtor & Creditor Laws §§276, 275, and
273, respectively. Claim twelve seeks relief against CMB and the
corporate defendants for the debts and obligations with respect
to the removal of hazardous waste of M2 on a theory of successor

liability. Claims thirteen and fourteen seek to pierce the corporate veil and impute corporate liability to the individual defendants.

Presently before the Court is defendants' motion to dismiss claims one through twelve, as against defendant Burlington, and to dismiss in their entirety claim two, claim six and claims eight through fourteen. For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

BACKGROUND

The following facts are drawn from the Amended Complaint, and are viewed in the light most favorable to Care, the non-moving party. *See Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002).

The Parties

Care is, and has been at all relevant times, a New Jersey corporation, authorized to conduct business in the State of New York, with its principal place of business located at 10 Orben Drive, Landing, New Jersey, 07850. It is engaged in the business of collection, identification, storage, transportation and disposal of hazardous waste materials.

Defendant M2 is, and has been at all relevant times, a Delaware corporation with its principal place of business located at 71 Carolyn Boulevard, Farmingdale, New York, 11735-1527. Its

authorization to do business in the State of New York is currently inactive. At all relevant times M2 has owned and operated Burlington.

Defendant Burlington is, and has been at all relevant times, a Delaware corporation with its principal place of business located at 71 Carolyn Boulevard, Farmingdale, New York, 11735-1527, and a location at 7033 Walrond Drive, Roanoke, Virginia 24019. Burlington acquired Dragon in 1998 and since then has owned and operated it.

Defendant Dragon is, and has been at all relevant times, a Delaware corporation with its principal place of business located at 71 Carolyn Boulevard, Farmingdale, New York, 11735-1527, and a location at 7033 Walrond Drive, Roanoke, Virginia 24019.

Defendant CMB is, and has been at all relevant times, a Delaware limited liability company with its principal place of business located at 71 Carolyn Boulevard, Farmingdale, New York 11735-1527, and an address at 2711 Centreville Road, Suite 400, Wilmington Delaware. During the pendency of this action M2 transferred substantially all its assets to CMB.[2] CMB operates out of the same physical location as M2 (the Farmingdale location), employs the same personnel, utilizes the same web

---

[2] This fact is alleged upon information and belief. As discussed further below, in a fraud claim facts may be alleged upon information and belief only in limited circumstances. To the extent relevant to analysis of the fraud claims, I have indicated those facts which were alleged upon information and belief.

address and website that M2 had previously used, and is owned by the same individuals as the owners of M2, namely defendants Brown and Sartorio.

Defendant Frank Monteleone is and has been at all relevant times, Chief Operating Officer of the Corporate Defendants and of CMB. He is alleged in the complaint to be a resident of New York state.

Defendant Dominick Sartorio is and has been at all relevant times, Chief Executive Officer of the corporate defendants and of CMB and a 50% shareholder of the corporate defendants and CMB.[3] He is alleged to reside in New York state.

Defendant Roger Brown is, and has been at all relevant times, the President of the corporate defendants and of CMB and a 50% shareholder of the corporate defendants and CMB.[4] He too is alleged to reside in New York state.

The Agreement

Prior to the agreement currently at issue in this litigation (the "Agreement"), Care had never conducted business with M2. Accordingly, as a pre-condition to entering into the Agreement with M2, Care required that M2 furnish Care with financial documentation demonstrating its ability to make the payments required under the Agreement. This documentation took two forms.

---

[3] Alleged upon information and belief.

[4] Alleged upon information and belief.

First, M2 provided Care with an internal draft of M2's
Consolidated Income Statement and Balance Statement for the year
ending September 30, 2004 (together, "M2's Financials"). These
financials showed, in relevant part, that M2 had net sales in
excess of $16 million and net income after taxes of more than
$1.25 million. Second, Care reviewed a report on M2 prepared by
Dun & Bradstreet (D&B) based on financial data provided to D&B by
Brown, M2's president. Relying on this financial information,
Care decided to enter into the Agreement with M2 for Care to
perform environmental services, including the collection and
removal of hazardous waste material at the Dragon facility in
Roanoke, Virginia, and the decontamination of the premises
following the removal. However, Care now asserts that this
financial information was false and misleading because M2 is not
in fact a profitable company with substantial assets, but rather
was already insolvent, or was rendered insolvent by the
obligation to pay Care under the Agreement.[5]

The Agreement consisted of a December 28, 2004 proposal, a
January 10, 2005 letter and a January 12, 2005 acceptance. Each
of these  documents was addressed to "M2 Technologies/Dragon
Chemical." The Agreement provided that Care would dispose of the
waste according to all applicable state and federal rules and
regulations. Estimated costs for the disposal were calculated

---

[5] This assertion is made based upon information and belief.

based on the weight of the waste to be disposed of, which M2
estimated to be 135,000 lbs. However the Agreement stated that
the estimation was not binding and that actual costs would be
calculated based on the actual weight of waste disposed of. Thus,
the Agreement provided in relevant part:

> • Care Environmental Corp. will furnish the services
> presented in this quotation on a per unit basis, based
> on the information and data provided to them. Care
> Environmental expects that the services in this
> quotation can be accomplished for the estimated fee.
>
> • The Client is responsible for any additional charges
> assessed by Care Environmental, for waste which exceeds
> the quoted constituent limits.
>
> • Upon receiving the D&B Business Information Progress
> Report, Care Environmental will base billing on Net 30
> days.[6]

Under the agreement Care would collect and transport the
hazardous waste material, but would not dispose of the material
itself. Rather, the disposal, accomplished by incineration, was
to be performed at third party disposal sites, contracted for by
Care. Because Care would have to pay the third party disposal
sites, Care needed M2 to pay the invoices on a timely basis.
Furthermore, the January 10 letter provided that:

> It is acknowledged that payments on invoices submitted
> to you [M2] in connection with these services are
> processed upon receipt [sic] invoices, and that no
> other documentation is required for the remittance of

---

[6] Neither party defined "net 30 days." However, plaintiff stated that
the invoices were issued on January 14, January 18, and February 2, and came
due, respectively, on February 12, February 17, and March 4. It therefore
appears that the "net 30 days" simply meant 30 days after the invoice was
issued.

payments to Care Environmental Corp. Kindly acknowledge
this by signing in the space below . . . If additional
documentation is required in order to remit payments on
invoices, please specify what documentation is required
in the space provided below and sign the
acknowledgment.

M2 did not specify any additional documentation that would be
required in order to remit payments on the invoices. Rather,
Frank Monteleone, as COO of M2, signed the letter under a
statement reading:

I hereby acknowledge, as an authorized representative,
that payments on invoices are authorized as stated
above.

Thereafter, Care began waste removal. Early in the project
it became apparent that the volume of waste was in excess of M2's
original estimate of 135,000 lbs. Care communicated this to M2's
COO, Monteleone and M2's general manager, Richard Howe. M2
directed Care to remove and dispose of all the waste,
notwithstanding the fact that the volume exceeded their initial
estimate.

On January 13, 2005 Care issued its first invoice to M2 in
the amount of $101,762.60. This invoice approached the total
amount of the initial estimate for total waste collection under
the Agreement, yet, at that juncture, an equivalent amount or
more of waste remained to be removed. Nevertheless, Monteleone
instructed Care to continue working to remove the remainder. M2
did not object to the amount of the initial invoice or the volume
stated therein.

Care continued to remove and transport the waste, and accordingly issued similar invoices on January 18 and February 2, 2005. M2 did not object to the dollar amount or volume of waste listed in these invoices.

Upon completion of the project in early February, Richard Howe, Dragon's plant manager, completed a walk through of the plant with an unidentified representative of Care. Howe expressed his thanks for a job well done and voiced no complaints. The owner of the building also conducted an inspection and voiced satisfaction with the appearance of the plant. On the final evening of the project, Howe went out to dinner with Care employee Daniel Schweitzer and told him that Care had done an excellent job. Howe offered to provide a letter of recommendation concerning the excellent quality of Care's services.

On February 12, 2005 the first invoice came due and was not paid. On February 17, 2005 the second invoice came due and was not paid. On March 4, 2005 the third invoice came due and was not paid.

Once the material was collected, Care trucked the material to various disposal facilities for incineration, and the third party facilities began disposal. The facilities, in turn, invoiced Care for the cost of the disposal. Thereafter, Care began to press M2 for payment. In response, M2 raised, for the first time, an objection to payment on the basis of the excessive

volume of material collected. M2 also objected to the inclusion of the weight of the pallets upon which the waste material had been stored in the disposal volume.

Care attempted to discuss these issues with Monteleone. However, numerous messages and voice mails left by Care's president, Francis McKenna Jr., and Care's operations manager Kodrowski for Monteleone were left unanswered. No payment was made even on that portion of the invoices which was uncontested. Concerned that it was incurring costs in the disposal of the waste which defendants did not intend to reimburse, McKenna sent a letter to Monteleone, stating in relevant part:

> You are of course entitled to be satisfied as the accuracy of our invoices, however, payment of all of our outstanding invoices is now grossly overdue. We cannot in good conscience continue to advance substantial sums of money in connection with the disposal of your waste in the face of our substantial outstanding invoices, none of which have been paid. Your conduct has left us with no alternative but to consider other alternatives, including instructing the disposal sites to suspend disposal of your material and/or returning any remaining unprocessed material to your premises.
>
> In order to move forward on an amicable basis, we must insist that you make substantial in-roads on our outstanding invoices immediately. We can and will certainly address any legitimate issues concerning our invoices, however, clearly the overwhelming majority of our services are not even in dispute. <u>I am prepared to meet with you at your offices on Monday, March 14, 2005 to work out a payment schedule and framework for resolving the outstanding issues. Please call me immediately so that we can arrange a mutually convenient time.</u> (emphasis in the original).

Care received no response. Accordingly, by letter dated March 18,

2005 Care's attorneys wrote to M2 stating:

> In light of your breach and failure to cure such
> breach, Care Environmental has been forced to mitigate
> its damages by instructing the disposal sites to
> suspend disposal of any material which has yet to be
> disposed of. Our client will not incur any further
> expense in view of your complete unwillingness to pay
> for the services contracted.
>
> Our client intends to return to you any material which
> has yet to be disposed of by the disposal sites. <u>Please
> contact me immediately to make arrangements to retrieve
> your material. If I do not hear from you immediately,
> our client will take whatever action it deems
> appropriate regarding the disposition of your
> materials, including, but not limited to, return of the
> materials to the point of origin, or any of your other
> locations</u>. Any expense to your client in this regard
> will be added to the amount of your outstanding
> balance. Should the balance remain unpaid, our client
> will take whatever action it deems appropriate,
> including bringing a lawsuit against all appropriate
> parties for monetary and other relief, including the
> full amount of the outstanding invoices, consequential
> damages, interest, attorney's fees and costs (emphasis
> in the original).

Neither Care nor its attorneys received any response to this
letter. Accordingly, on March 28, 2005 plaintiff filed the
original complaint in this case. On August 12, 2005, plaintiff
filed a motion for partial summary judgment, which I denied from
the bench on September 29, 2005. On September 27, 2005 plaintiff
filed the amended complaint which is the subject of this motion.

DISCUSSION

Defendants seek partial dismissal of plaintiff's amended
complaint for failure to state a claim upon which relief can be
granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In

considering a motion pursuant to Rule 12(b)(6), a court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)(citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. V. Town of Darien*, 56 F.3d 375,378 (2d Cir. 1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80,83 (2d Cir. 2000). Additionally, a complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) if the Court finds that the plaintiff's claims are barred as a matter of law. *Conopco, Inc. v. Roll Intern.,* 231 F.3d 82, 86 (2d Cir. 2000). A Court is permitted to take into account the contents of documents attached to or incorporated in the complaint.[7] *Colmas v. Harsett*, 886 F.2d 8,13 (2d Cir. 1989).

---

[7] The only documents attached to the complaint were those documents constituting the Agreement.

Claims Against Burlington

Defendants argue that all claims against Burlington must be
dismissed because Burlington did not sign the contract
establishing an agreement between M2 Technologies, Dragon, and
Care and because plaintiff has failed to allege any other facts
which would suggest that plaintiff had a relationship with
Burlington which could give rise to liability.  Plaintiff's
amended complaint merely alleges that Burlington owns Dragon. One
corporations mere ownership of another corporation does not
create liability. *See e.g., Dole Food Co. v. Patrickson*, 538 U.S.
468, 475 (2003)(declining to extend the doctrine of piercing the
corporate veil "so far that as a catagorical matter all
subsidiaries are deemed to be the same as the parent
corporation.") Plaintiff now argues that Burlington is liable
because Dragon's website stated that in 1998 Burlington,
"purchased Dragon Corporation and began doing business as Dragon
Corp."

Even assuming the content of Dragon's website, which was not
alleged in the complaint, could be considered on this motion, the
words "doing business as" or the abbreviation d/b/a indicate that
the name following is an assumed name. *Black's Law Dictionary* 425
(8th edition 2004). Thus, Burlington's statement that Burlington
is doing business as Dragon indicates that Dragon is merely an
assumed name for Burlington. New York law requires that a person

or corporation carrying on business in the name of another file a

certificate designating the assumed name with the office of the

Secretary of State. CPLR §130(1)(b). Plaintiff's computer-

assisted search turned up no such filings by Burlington. Pl.

Reply Aff. Cohen. However, a company's failure to file such a

certificate does not preclude liability.

> [Defendant] has not filed with the Secretary of State a
> certificate setting forth the name or designation under
> which business is conducted as required by CPLR
> §130(1)(b). . .[Nevertheless] the law is clear that the
> designation "d/b/a" means "doing business as" but is
> merely descriptive of the person or corporation who
> does business under some other name. Doing business
> under another name does not create an entity [separate]
> from the person operating the business. The individual
> who does business as a sole proprietor under one or
> several names remains one person, personally liable for
> all his obligations. So also with a corporation which
> uses more than one name.

*In re Golden Distributors, Ltd.* 134 B.R. 766, 768-769 (Bkrtcy.

S.D.N.Y. 1991)(citing *Duval v. Midwest Auto City, Inc.,* 425 F.

Supp. 1381 (D. Nebraska 1977)*, aff'd* 578 F.2d 721 (8th Cir.

1989). Thus, because a corporation which does business under more

than one name remains only one corporation, Burlington may be

held liable for actions or inactions by Dragon.[8] A separate claim

---

[8] Plaintiff argues Burlington should be treated as an undisclosed
principal, acting through its agent, Dragon, and that under general agency
laws, Burlington should be held liable for the torts and the contracts of its
agents. *See e.g. J.P Endeavours v. Dushaj*, 778 N.Y.S.2d 531, 533 (2nd Dep't
2004)(stating that the "general rule is that the agent for an undisclosed
principal is liable on any contracts that he or she made on behalf of the
principal)*; Fletcher v. Atex, Inc.*, 861 F. Supp. 242, 247 (S.D.N.Y.
1994)(holding that principals are liable for the tortious acts of their
agents). However, the agency analysis is unnecessary. Where one corporation
does business as another it is not treated as acting on behalf of the second

for relief against Dragon must be dismissed with leave for
plaintiff to amend the complaint to state claims against
Burlington d/b/a Dragon or Burlington.

Claim Six – Book Account

A claim for a "book account" is a statutory action based on
the theory that the parties maintained an open account and the
account shows a balance due and owing the plaintiff. *See e.g.,*
*B&K Plumbing & Heating Co. v. Hansen*, 212 N.Y.S.2d 647, 648
(Nassau Dist. Ct. 1961). Defendants correctly argue that
plaintiff cannot recover on such a claim because, "there is no
New York statute authorizing such an action." *Id.* at 649; *accord*
*Waldman v. Englishtown Sportswear, Ltd.,* 92 A.D.2d 833, 836 (1st
Dep't 1983). Plaintiff now concedes that no such claim exists in
New York. Pl. Mem. Law. pg. 3, n. 4. Accordingly, plaintiff's
book account claim is dismissed.

Level of Particularity Required for Fraud Claims

Defendant argues that the second claim for relief for
fraudulent misrepresentation, the eighth claim for relief for
common law fraud, and the ninth, tenth and eleventh claims for
relief arising under New York Debtor and Creditor Law should be
dismissed because each fails to plead fraud with particularity as

---

corporation, but rather, they are treated as a single entity. Thus, in *Duval,*
425 F. Supp. 1381, the court stated that although five defendants were listed
on the complaint, only four actually existed since the corporation doing
business under another name is treated as only one defendant.

required by Federal Rule of Civil Procedure 9(b), and that the eight and eleventh claims also fail because they are alleged solely upon information and belief. I will first lay out the general requirements for complaints based upon fraud and then address each claim individually.

Federal Rule of Civil Procedure 9(b) provides special pleading requirements for claims sounding in fraud. Specifically, the rule provides that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of the mind of a person may averred generally.

The rule is "intended to ensure that each defendant is provided with reasonable detail concerning the nature of his particular involvement in the alleged fraud." *The Equitable Life Assurance Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y. 1985). Accordingly, in a fraud allegation the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acad. v. IMCERA Group Inc.,* 47 F.3d 47, 51 (2d Cir. 1995).

However, a "[p]laintiff need not plead dates, times and places with absolute precision, so long as the complaint gives

'fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'" *Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 2003 WL 22218643 *7 (S.D.N.Y. 2003)(citing *Int'l Motor Sports Group, Inc., v. Gordon*, 1999 WL 619633 *3 (S.D.N.Y. 1991). Thus, Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map." *Gelles v. TDA Indus., Inc.,* 1991 WL 39673 *6 (S.D.N.Y. 1991). "Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed. R. Civ. P. 8(a) which requires only a 'short and plain statement' of the claims for relief and Fed. R. Civ. P. 8(f), which provides that 'all pleadings shall be so construed as to do substantial justice.'" *Goldin Associates*, 2003 WL 22218643 *7 (S.D.N.Y. 2003)(citations omitted); Wright & Miller, §1298 at 10565.

Because allegations of fraud must be pled with particularity, fraud pleadings cannot generally be based upon information and belief. *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972). "There is a recognized exception to this rule, however, that fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.

1987)(collecting cases).

Claim Two - Fraudulent Misrepresentation

Plaintiff alleges that defendants withheld their objection to plaintiff's bill until after plaintiff had completed its work in order to induce plaintiff to continue to remove material, expend labor, material and resources and incur financial obligations for the disposal of defendants' material and that this omission constituted a fraudulent misrepresentation.

To state a claim for fraudulent misrepresentation under New York law a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 186 -187 (2d Cir. 2004)(quoting, *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995)). Since, as discussed above, fraud must be pled with particularity, the plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui,* 91 F.3d 337,

347 (2d Cir. 1996).

Omissions come in two forms, only one of which is actionable in a fraudulent misrepresentation claim. In the first, actionable type of omission, a party makes an affirmative statement which is incomplete and misleading as the result of some omission. In the second, unactionable type a party makes no statement at all, and the failure to make any statement is the omission. The present case deals with the second type of omission which is unactionable because, "mere silence, without some act which deceived [the plaintiff], cannot constitute a concealment that is actionable as fraud." *Rosenblatt v. Christie, Manson & Woods Ltd.*, 2005 WL 2649027, *10 (S.D.N.Y. 2005) (quoting *Mobil Oil Corp. v. Joshi*, 202 A.D.2d 318, 318, 609 N.Y.S.2d 214, 215 (N.Y.A.D. 1 Dept. 1994)). Accordingly, defendant's motion to dismiss this claim is granted.

Claim Eight[9]

Plaintiff alleges that the corporate defendants committed common law fraud when M2 submitted financial documents which were false and misleading because they purported to show that M2 was a profitable company with substantial assets, while it was not.

---

[9] Plaintiff argues that the "law of the case doctrine" mandates that the claims added by the amended complaint (claims 7-13) not be dismissed because in permitting plaintiff to amend the complaint the Magistrate Judge ruled that the amendment was not "futile." However, the decision to grant a request to amend a complaint and the decision to deny a motion to dismiss are two different issues, and one cannot constitute the law of the case for the other.

To prove common law fraud under New York law, a plaintiff must prove the same elements as required for a fraudulent misrepresentation claim. *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

Defendants argue that plaintiff's claim fails because it does not specify exactly what was false or misleading about the financial statements. The amended complaint asserts that M2's financials reflect net sales of over $16 million and net income after taxes of over $1.25 million. It further asserts, upon information and belief that the financials given by Monteleone to Care were false and misleading because they purported to show that M2 Technologies was a profitable company with substantial assets, when that was not the case. As discussed above, such pleading upon information and belief is permitted as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based. M2's financial situation is a fact peculiarly within its knowledge and plaintiff did submit a statement of the facts upon which its belief is based. According to the certification of Care's president, Francis McKenna, M2's balance sheet for the year ending September 30, 2004 showed that it had total current assets of over $5.6 million, liabilities of $3.285 million, and stockholder's equity of over $2.6 million.

However, according to the affirmation of Jonathan Lerner,
plaintiff's counsel, his request for financial disclosure from
defense counsel was met with a response stating that, "M2 never
had any assets whatsoever."[10] Thus, plaintiff has asserted
exactly what is misleading about M2's financials; the financials
reflect significant assets, while M2's attorneys now state that
it never had, and does not currently have, any assets. Care has
also asserted that defendants intended Care to rely on this
misrepresentation, (Amended Complaint ¶83) that Care's reliance
on it was reasonable (¶85) and that as a result Care has been
damaged (¶85).

As to the individual defendants, the amended complaint also
alleges, upon information and belief, that Brown and Sartorio
knew, or should have known, that M2 technologies, by and through
Monteleone, was conveying false and misleading information about
M2's financial situation. Defendant objects on the ground that

---

[10] This statement was made by defense counsel in the course of a
settlement negotiation. Generally Federal Rule of Evidence 408 shields
statements made in settlement negotiations from being admitted against the
party who made them. However, that rule does not exclude evidence, "merely
because it was presented in the course of compromise negotiations." "Rule 408
is not an absolute ban on all evidence regarding settlement negotiations."
*Bankard Am., Inc. v. Universal Bankcard Sys. Inc.,* 203 F.3d 477, 484 )7th Cir.
2000). Thus, where, as here, the evidence could be acquired by other means,
and indeed would inevitably be uncovered during discovery, such evidence may
be considered on a motion to dismiss. *Agan v. Katzman & Korr, P.A.,* F. Supp.2d
1363, 1370 (S.D.Fla 2004); (exhibits attached to a complaint were "otherwise
discoverable and therefore not barred by Fed. R. Evid. 408."); *Liataud v.
GenerationXcellent, Inc.,* 2002 WL 230799 (N.D. Ill. 2002) (holding that where
the allegations, "if true, [could] easily be proven independently" of the
settlement negotiations" the allegations "will not be stricken" and the
complaint will suffice.);

fraud claims may not be pleaded upon conclusory allegations.
However, the text of Rule 9(b) specifically provides that,
"[m]alice, intent, knowledge, and other conditions of the mind of
a person may averred generally." Defendant also complains that
fraud claims may not be plead upon information and belief. As
discussed above, there is a recognized exception to this rule, as
to facts peculiarly within the opposing party's knowledge. The
extent of the individual defendants knowledge is precisely
something that is peculiarly within defendants knowledge.
However, when such facts are plead upon information and belief
they must be accompanied by a statement of the facts upon which
the belief is based." Plaintiff provides no statement of facts
upon which the belief is based. Accordingly, as against the
individual plaintiffs this count must be dismissed with leave to
amend.

## Claim Nine (DCL §276) Ten (DCL §275)

Plaintiff alleges that defendants have violated DCL §275
which provides

> Every conveyance made and every obligation incurred
> without fair consideration when the person making the
> conveyance or entering into the obligation intends or
> believes that he will incur debts beyond his ability to
> pay as they mature, is fraudulent as to both present
> and future creditors.

and §276, which provides that

> Every conveyance made and every obligation incurred
> with actual intent, as distinguished from intent

> presumed in law, to hinder, delay, or defraud either
> present or future creditors, is fraudulent as to both
> present and future creditors.

As discussed above, these claims must be pled with particularity

because they are fraud claims. However, as the court in *Eclaire*

*Advisor Ltd. as Trustee to Daewoo International (America) Corp.*

*Creditor Trust v. Daewoo Engineering & Construction Co.,* 375

F.Supp.2d 257, 268 (S.D.N.Y. 2005) stated:

> A party seeking to set aside a fraudulent conveyance
> under § 276 [and §275] must plead an actual intent to
> defraud with particularity sufficient to meet the
> heightened standard of Fed.R.Civ.P. 9(b). Nevertheless,
> because direct proof of fraudulent intent is usually
> difficult to obtain, such intent may be inferred from
> circumstantial evidence, or "badges of fraud." This
> evidence may consist of: (1) the inadequacy of
> consideration received in the allegedly fraudulent
> conveyance; (2) the close relationship between parties
> to the transfer; (3) information that the transferor
> was rendered insolvent by the conveyance; (4)
> suspicious timing of transactions or existence of a
> pattern after the debt had been incurred or a legal
> action against the debtor had been threatened; or (5)
> the use of fictitious parties.

In the present case the plaintiff does not have knowledge of the

details of the transfer, such as what consideration was paid.

However, the amended complaint alleges that there was a close

relationship between the parties since M2 and CMB had identical

management, facilities and ownership. The amended complaint also

alleges that M2 transferred all or substantially all of its

assets, thus rendering it insolvent.[11] Finally, the amended

---

[11] Although the complaint alleged identical ownership and transfer of
assets only upon information and belief, (which, as discussed above, is
generally impermissible in a fraud claim), these allegations concern facts

complaint alleges that the timing of the transfer was suspicious in that it occurred during the pendency of the current action. These "badges of fraud" allow an inference that defendants intended to defraud the plaintiffs.

Eleven (§273)

Plaintiff claims defendants have violated New York Debtor and Creditor Law §273 which provides that

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Defendants allege that plaintiff has not pled this claim with the particularity required by Rule 9(b). "However, the sections of New York law here at issue deal with constructive fraud, whereby certain transactions are fraudulent as a matter of law because of when or for what consideration they were made, and not because they were undertaken with fraudulent intent. This is not the kind of fraud to which Rule 9(b) applies." *Eclaire Advisor Ltd. as Trustee to Daewoo International (America) Corp. Creditor Trust v. Daewoo Enineering & Construction Co.,* 375 F.Supp.2d 257, 268

---

peculiarly within the defendants' knowledge and plaintiff's have provided a statement of facts upon which these allegations are based. The McKenna certification states that according to the D&B report Brown and Sartorio were each 50% owners of M2. The certification of plaintiff's counsel, Jonathan Lerner, states that the CMB website retains the identical layout, photos and text as the M2 website, but identifies the company name as CMB and identifies the pictured individuals as officers of CMB. Furthermore, defense counsel stated that M2 has no assets. Accordingly, plaintiff's conclude that M2 has transferred all of its assets to CMB but that ownership and operations remain the same.

(S.D.N.Y. 2005)(citing *Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934). Accordingly, a complaint adequately pleads a violation of §273 when it meets "the bare-bones pleading requirements of Rule 8, by alleging the basic elements of each statute." *Eclaire*, 2005 WL 1298708 at *9. Care's amended complaint does allege the basic elements fo §273 since it alleges that the contractual obligation was incurred without fair consideration and that M2 was insolvent or rendered insolvent when in incurred the obligation to pay Care under the terms of the agreement.

<u>Twelfth Claim for Relief - Successor Liability</u>

The general rule is that a corporation that acquires the assets of another is not liable for the torts of its predecessor. However, there are four settled exceptions: (1) if the successor expressly or impliedly assumed the predecessor's tort liability; (2) there was a consolidation or merger of seller and purchaser; (3) the purchasing corporation was a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape such obligations. *Schumacher v. Richards Shears Co., Inc.,* 59 N.Y.2d 239, 245 (N.Y. 1983).

The complaint alleges that CMB may be liable under

exceptions two, three and four.[12] The second and third exceptions
are generally considered together as the de facto merger theory,
because they overlap to such an extent that "no criteria can be
identified that distinguish them in any useful manner." *Lumbard
v. Maglia* 621 F. Supp 1529 (S.D.N.Y. 1985), quoting J. Phillips,
*Product Line Continuity and Successor Corporation Liability*, 58
N.Y.U.L.Rev. 906, 909 (1983).  Four factors are indicative of a
defacto merger: (1) continuity of ownership; (2) cessation of
ordinary business operations and the dissolution of the selling
corporation as soon as possible after the transaction; (3) the
buyer's assumption of liabilities ordinarily necessary for the
uninterrupted continuation of the seller's business; and (4)
continuity of management, personnel, physical location, assets
and general business operation. *Id*. at 1535. "Not all of these
factors are needed to demonstrate a merger; rather, these factors
are only indicators that tend to show a *de facto* merger." *Id.*
(quoting *Menacho v. Adamson United Co.,* 420 F.Supp. 128, 133
(D.N.J. 1976)).

The first factor, continuity of ownership has been held to
be the essence of a merger, and is accordingly a prerequisite to
the application of any de facto merger doctrine.  *New York City*

---

[12] Because I conclude that plaintiff's claim should not be dismissed
under exceptions two and three, I do not reach the issue of whether
plaintiff's claim should be dismissed under exception four.

*Asbestos Litig.,* 789 N.Y.S.2d 484, 486 (N.Y. App. Div. 2005). Such continuity "exists when the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets, as occurs in a stock-for-assets transaction." *Id.* Here, plaintiff's complaint alleges that Brown and Sartorio were each 50% owners of M2, and are now each 50% owners of CMB. Accordingly, plaintiff has demonstrated the necessary continuity of ownership.

The second factor is cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction. Plaintiff alleges that M2 has ceased operating completely under that name. Plaintiff also alleges that M2's authorization to do business in the state of New York is inactive. Plaintiff has thus demonstrated that M2 meets the first prong of this factor. Plaintiff has not alleged however, that M2 has actually dissolved.

The third factor considers the buyer's assumption of liabilities ordinarily necessary for the uninterrupted continuation of the seller's business. The complaint does not specifically allege that CMB has assumed M2's liabilities ordinarily necessary for the uninterrupted continuation of the seller's business.

The fourth and final factor considers continuity of

management, personnel, physical location, assets and general
business operation. Care alleges that CMB has taken over all of
the assets of M2, employs the same key personnel, operates out of
the same location, and uses the same web address, and the same
website as M2, having identical content and layout with the only
change that "M2" is replaced by "CMB."

Thus, plaintiff has alleged most of the factors indicating
successor liability. Where, as here, "the amended complaint does
not thoroughly describe every indicator of a *de facto* merger,"
but "clearly describes the wholesale transformation of one
company, [M2], into another, [CMB], a court should not dismiss
the plaintiff's complaint. *Lumbard,* 621 F.Supp at 1536. It is
sufficient that  "the amended complaint alleges that [CMB]
continued the enterprise of [M2] with the same employees, assets,
and management." Id.

Claims Thirteen and Fourteen - Piercing the Corporate Veil

Plaintiff asserts that the "corporate veil" of M2 should be
pierced in order to hold the individual defendants liable because
they exercised their complete dominion and control over M2 to
perpetrate fraud (count thirteen) and to ensure that M2 was
inadequately capitalized (count fourteen).

Defendants first argue that plaintiff cannot succeed on
these claims, because an assertion that the individual defendants

exercised complete dominion or control over M2 contradicts
plaintiff's theory that M2 did not really exist, but was rather
an extension of the individual defendants, as evidenced by
statements in the complaint that plaintiff contracted with M2 to
perform services, obtained and reviewed M2's financial
statements, and reviewed the Dun & Bradstreet information for M2.
However, this argument is unavailing because pursuant to Federal
Rule of Civil Procedure Rule 8(e)(2), a "party may also state as
many separate legal claims or defenses as the party has
regardless of consistency." *See also*, *ESI, Inc., v. Coastal
Corp.,* 61 F. Supp. 2d 35, 71 (S.D.N.Y. 1999)("Fed. R. Civ. P.
8(e)(2) expressly permits a plaintiff to set forth alternative
and even inconsistent statements of a claim . . ."). Accordingly,
even assuming that plaintiff's claims were inconsistent,
plaintiff would be allowed to plead both.

Under New York law, a party seeking to pierce the corporate
veil must generally show that: (1) the owners exercised complete
domination of the corporation in respect to the transaction
attacked; and (2) that such domination was used to commit a fraud
or wrong against the plaintiff which resulted in plaintiff's
injury. *Morris v. New York State Dept. of Taxation and Finance,*
82 N.Y.2d 135, 140 (N.Y. 1993). Plaintiff argues that it may
prevail by showing either fraud or complete domination. In
support of this proposition plaintiff cites four second circuit

cases which have so held. See *William Wrigley Jr. Company v. Waters,* 890 F.2d 594 (2d Cir. 1989); *William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir. 1990); *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979).

However, these cases can be distinguished on the basis that they all referenced situations in which a plaintiff attempted to pierce the corporate veil based only upon a showing of domination, but not a showing of fraud. In the present case, plaintiff argues that it may prevail based only on a showing of fraud without a showing of domination. Plaintiff cites no cases, and this court could find no cases in which fraud alone was sufficient to sustain a piercing the corporate veil claim. Moreover, the most recent case cited by plaintiff is from 1991. All of the more recent cases hold that both elements must be shown in order to pierce the corporate veil. See e.g. *TNS Holdings, Inc. v. MKI Secs. Corp.,* 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 893, 703 N.E.2d 749, 751 (1998) ("Evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance."); *EED Holdings v. Palmer Johnson Acquisition Corp.,* 228 F.R.D. 508, 512 (S.D.N.Y. 2005)(stating that "both of these elements must be established in order to justify application of the veil-piercing doctrine.");

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 295 F Supp. 2d 366, 379 (S.D.N.Y. 2003) (stating that both elements of a veil-piercing claim must be alleged); *Zinamen v. USTS New York, Inc.,* 798 F. Supp. 128, 131 (S.D.N.Y. 1992). Thus, in order to prevail on a veil-piercing claim, the plaintiff must allege both domination and fraud.

In considering the first element, whether a corporation is a separate entity or is actually only a front for another corporation or individual, New York courts consider a variety of factors, including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*DER Travel Services, Inc. v. Dream Tours & Adventures, Inc.*, 2005 WL 2848939, *8(S.D.N.Y. 2005)(collecting cases). Plaintiff conclusorily alleges that the individual defendant's exercised

complete dominion or control over M2.[13] In support plaintiff offers only its allegation, upon information and belief, that M2 was undercapitalized.[14] However, undercapitalization, without more, is an insufficient basis to pierce the corporate veil. *DER Travel Services, Inc. v. Dream Tours & Adventures, Inc.,* 2005 WL 2848939, *8 (S.D.N.Y. 2005); *Oriental Commercial & Shipping Co., Ltd. v. Rosseel, N.V.,* 702 F.Supp. 1005, 1020 (S.D.N.Y. 1988); *see also Al Sayegh Bros. Trading (LLC) v. Doral Trading & Exp., Inc.,* 219 F.Supp.2d 285, 294 (E.D.N.Y. 2002). Accordingly, plaintiff's claims for piercing the corporate veil are dismissed with leave to amend.

CONCLUSION

For the reasons set forth above the defendants' motion to dismiss is granted in part and denied in part. Any amended complaint allowed by this decision must be filed within thirty (30) days of the date of this decision.

---

[13] "Veil-piercing claims are generally subject to the pleading requirements imposed by Fed.R.Civ.P. 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. However, where a veil-piercing claim is based on allegations of fraud, the heightened pleading standard of Rule 9(b) is the lens through which those allegation[s] must be examined. *EED Holdings v. Palmer Johnson Acquisition Corp.,* 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (citations omitted). However, I need not decide which standard applies in this case because plaintiff's conclusory allegations fail to meet even the more lenient 8(a) standard. *In re Currency Conversion Fee Antitrust Litig.,* 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003) (stating that "purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard [under Rule 8(a) ].")

[14] Plaintiff's allege the undercapitalization as the "wrong" perpetrated by the defendants. It is also a factor to be considered in determining the domination element of a piercing the corporate veil claim.

The Clerk is directed to furnish a copy of the within to the parties and to the Magistrate Judge.

SO ORDERED.

Dated :   Brooklyn, New York

          January 18, 2006


                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                        United States District Judge