UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Care Environmental Corporation,

                   Plaintiff,          CV-05-1600 (CPS)

   - against -              MEMORANDUM OPINION
                               AND ORDER
M2 Technologies Inc., et al,

                  Defendants.

-----------------------------------------X

SIFTON, Senior Judge.

     Plaintiff, Care Environmental Corporation ("Care"), invokes
this Court's diversity jurisdiction to bring this action against
M2 Technologies Inc., ("M2"), Dragon Chemical Corporation
("Dragon"), Burlington Bio-medical Corporation ("Burlington")
(collectively the "corporate defendants"), against Frank
Monteleone, Dominick Sartorio and Roger Brown (collectively the
"individual defendants") and against CMB Additives, LLC ("CMB").
Plaintiff's amended complaint alleges eleven claims for relief.
Claims one through four seek judgment against the corporate
defendants for breach of contract (count two), services sold and
delivered (count three), and account stated (count four). The
fifth claim for relief alleges common law fraud against the
corporate defendants and the individual defendants. Claim six
seeks relief against CMB and the corporate defendants for the
debts and obligations with respect to the removal of hazardous
waste of M2 on a theory of successor liability. Claims seven and

eight seek to pierce the corporate veil and impute corporate
liability to the individual defendants. Claims nine through
eleven seek recovery against the individual and corporate
defendants under New York Debtor & Creditor Laws §§276, 275, and
273, respectively.  Presently before the Court is defendants'
motion for leave to amend their answer to assert four
counterclaims. For the reasons set forth below the defendants'
motion is granted in part and denied in part.

BACKGROUND

The following facts are drawn from my prior opinion
addressing plaintiff's motion to dismiss the complaint and from
the Second Amended Complaint.

<u>The Parties</u>

Care is, and has been at all relevant times, a New Jersey
corporation, authorized to conduct business in the State of New
York, with its principal place of business located at 10 Orben
Drive, Landing, New Jersey, 07850. It is engaged in the business
of collection, identification, storage, transportation and
disposal of hazardous waste materials.

Defendant M2 is, and has been at all relevant times, a
Delaware corporation with its principal place of business located
at 71 Carolyn Boulevard, Farmingdale, New York, 11735-1527. Its
authorization to do business in the State of New York is
currently inactive. At all relevant times M2 has owned and

- 3 -

operated Burlington.

Defendant Burlington is, and has been at all relevant times,
a Delaware corporation with its principal place of business
located at 71 Carolyn Boulevard, Farmingdale, New York, 11735-
1527, and a location at 7033 Walrond Drive, Roanoke, Virginia
24019. Burlington acquired Dragon in 1998 and since then has
owned and operated it.

Defendant Dragon is, and has been at all relevant times, a
Delaware corporation with its principal place of business located
at 71 Carolyn Boulevard, Farmingdale, New York, 11735-1527, and a
location at 7033 Walrond Drive, Roanoke, Virginia 24019.

Defendant CMB is, and has been at all relevant times, a
Delaware limited liability company with its principal place of
business located at 71 Carolyn Boulevard, Farmingdale, New York
11735-1527, and an address at 2711 Centreville Road, Suite 400,
Wilmington Delaware. During the pendency of this action M2
transferred substantially all its assets to CMB. CMB operates out
of the same physical location as M2 (the Farmingdale location),
employs the same personnel, utilizes the same web address and
website that M2 had previously used, and is owned by the same
individuals as the owners of M2, namely defendants Brown and
Sartorio.

Defendant Frank Monteleone is and has been at all relevant
times, Chief Operating Officer of the Corporate Defendants and of

CMB. He is alleged in the complaint to be a resident of New York state.

Defendant Dominick Sartorio is and has been at all relevant times, Chief Executive Officer of the corporate defendants and of CMB and a 50% shareholder of the corporate defendants and CMB. He is alleged to reside in New York state.

Defendant Roger Brown is, and has been at all relevant times, the President of the corporate defendants and of CMB and a 50% shareholder of the corporate defendants and CMB. He too is alleged to reside in New York state.

The Agreement

Prior to the agreement at issue in this litigation (the "Agreement"), Care had never done business with M2. Accordingly, as a pre-condition to entering into the Agreement with M2, Care required that M2 furnish Care with financial documentation demonstrating its ability to make the payments required under the Agreement. This documentation took two forms. First, M2 provided Care with an internal draft of M2's Consolidated Income Statement and Balance Statement for the year ending September 30, 2004 (together, "M2's Financials"). These financials showed, in relevant part, that M2 had net sales in excess of $16 million and net income after taxes of more than $1.25 million. Second, Care reviewed a report on M2 prepared by Dun & Bradstreet (D&B) based on financial data provided to D&B by Brown, M2's president.

Relying on this financial information, Care decided to enter into the Agreement with M2 for Care to perform environmental services, including the collection and removal of hazardous waste material at the Dragon facility in Roanoke, Virginia, and the decontamination of the premises following the removal. Care now asserts that this financial information was false and misleading because M2 is not in fact a profitable company with substantial assets, but rather was already insolvent, or was rendered insolvent by the obligations to Care under the Agreement.

The Agreement consisted of a December 28, 2004 proposal, a January 10, 2005 letter and a January 12, 2005 acceptance. Each of these  documents was addressed to "M2 Technologies/Dragon Chemical." The Agreement provided that Care would dispose of the waste in compliance with all applicable state and federal rules and regulations. Estimated costs for the disposal were calculated based on the weight of the waste to be disposed of, which M2 estimated to be 135,000 lbs. However the Agreement stated that the estimation was not binding and that actual costs would be calculated based on the actual weight of waste disposed of. Thus, the Agreement provided in relevant part:

- Care Environmental Corp. will furnish the services presented in this quotation on a per unit basis, based on the information and data provided to them. Care Environmental expects that the services in this quotation can be accomplished for the estimated fee.

- The Client is responsible for any additional charges assessed by Care Environmental, for waste which exceeds

the quoted constituent limits.

• Upon receiving the D&B Business Information Progress Report, Care Environmental will base billing on Net 30 days.[1]

Under the agreement Care would collect and transport the hazardous waste material, but would not dispose of the material itself. Rather, the disposal, accomplished by incineration, was to be performed at third party disposal sites, contracted for by Care. Because Care would have to pay the third party for disposal, Care needed M2 to pay the invoices on a timely basis. Furthermore, the January 10 letter provided that:

> It is acknowledged that payments on invoices submitted to you [M2] in connection with these services are processed upon receipt [sic] invoices, and that no other documentation is required for the remittance of payments to Care Environmental Corp. Kindly acknowledge this by signing in the space below . . . . If additional documentation is required in order to remit payments on invoices, please specify what documentation is required in the space provided below and sign the acknowledgment.

M2 did not specify any additional documentation that would be required in order to remit payments on the invoices. Rather, Frank Monteleone, as COO of M2, signed the letter under a statement reading:

> I hereby acknowledge, as an authorized representative, that payments on invoices are authorized as stated above.

---

[1] Neither party defines "net 30 days." However, plaintiff stated that the invoices were issued on January 14, January 18, and February 2, and came due, respectively, on February 12, February 17, and March 4. It therefore appears that the "net 30 days" simply means 30 days after the invoice was issued.

Thereafter, Care began waste removal. Early in the project it became apparent that the volume of waste was in excess of M2's original estimate of 135,000 lbs. Care communicated this to M2's COO, Monteleone and M2's general manager, Richard Howe. M2 directed Care to remove and dispose of all the waste, notwithstanding the fact that the volume exceeded their initial estimate.

On January 13, 2005 Care issued its first invoice to M2 in the amount of $101,762.60. This invoice approached the total amount of the initial estimate for total waste collection under the Agreement, yet, at that juncture, an equivalent amount or more of waste remained to be removed. Nevertheless, Monteleone instructed Care to continue working to remove the remainder. M2 did not object to the amount of the initial invoice or the volume stated therein.

Care continued to remove and transport the waste, and accordingly issued similar invoices on January 18 and February 2, 2005. M2 did not object to the dollar amount or volume of waste listed in these invoices.

Upon completion of the project in early February, Richard Howe, Dragon's plant manager, completed a walk through of the plant with an unidentified representative of Care. Howe expressed his thanks for a job well done and voiced no complaints. The owner of the building also conducted an inspection and voiced

satisfaction with the appearance of the plant. On the final evening of the project, Howe went out to dinner with Care employee Daniel Schweitzer and told him that Care had done an excellent job. Howe offered to provide a letter of recommendation concerning the excellent quality of Care's services.

On February 12, 2005 the first invoice came due and was not paid. On February 17, 2005 the second invoice came due and was not paid. On March 4, 2005 the third invoice came due and was not paid.

Once the material was collected, Care trucked the material to various disposal facilities for incineration, and the third party facilities began disposal. The facilities, in turn, invoiced Care for the cost of the disposal. Thereafter, Care began to press M2 for payment. In response, M2 raised, for the first time, an objection to payment on the basis of the excessive volume of material collected. M2 also objected to the inclusion of the weight of the pallets upon which the waste material had been stored in the disposal volume.

Care attempted to discuss these issues with Monteleone. However, numerous messages and voice mails left by Care's president, Francis McKenna Jr., and Care's operations manager Kodrowski for Monteleone were left unanswered. No payment was made even on that portion of the invoices which was uncontested. Concerned that it was incurring costs in the disposal of the

waste which defendants did not intend to reimburse, McKenna sent

a letter to Monteleone, stating in relevant part:

> You are of course entitled to be satisfied as the
> accuracy of our invoices, however, payment of all of
> our outstanding invoices is now grossly overdue. We
> cannot in good conscience continue to advance
> substantial sums of money in connection with the
> disposal of your waste in the face of our substantial
> outstanding invoices, none of which have been paid.
> Your conduct has left us with no alternative but to
> consider other alternatives, including instructing the
> disposal sites to suspend disposal of your material
> and/or returning any remaining unprocessed material to
> your premises.
>
> In order to move forward on an amicable basis, we must
> insist that you make substantial in-roads on our
> outstanding invoices immediately. We can and will
> certainly address any legitimate issues concerning our
> invoices, however, clearly the overwhelming majority of
> our services are not even in dispute. <u>I am prepared to
> meet with you at your offices on Monday, March 14, 2005
> to work out a payment schedule and framework for
> resolving the outstanding issues. Please call me
> immediately so that we can arrange a mutually
> convenient time.</u> (emphasis in the original).

Care received no response. Accordingly, by letter dated March 18,

2005 Care's attorneys wrote to M2 stating:

> In light of your breach and failure to cure such
> breach, Care Environmental has been forced to mitigate
> its damages by instructing the disposal sites to
> suspend disposal of any material which has yet to be
> disposed of. Our client will not incur any further
> expense in view of your complete unwillingness to pay
> for the services contracted.
>
> Our client intends to return to you any material which
> has yet to be disposed of by the disposal sites. <u>Please
> contact me immediately to make arrangements to retrieve
> your material. If I do not hear from you immediately,
> our client will take whatever action it deems
> appropriate regarding the disposition of your
> materials, including, but not limited to, return of the</u>

> materials to the point of origin, or any of your other
> locations. Any expense to your client in this regard
> will be added to the amount of your outstanding
> balance. Should the balance remain unpaid, our client
> will take whatever action it deems appropriate,
> including bringing a lawsuit against all appropriate
> parties for monetary and other relief, including the
> full amount of the outstanding invoices, consequential
> damages, interest, attorney's fees and costs (emphasis
> in the original).

Neither Care nor its attorneys received any response to this letter. Accordingly, on March 28, 2005 plaintiff filed the original complaint in this case. On April 25, 2005 defendants filed their answer. On August 12, 2005, plaintiff filed a motion for partial summary judgment, which I denied from the bench on September 29, 2005. On September 27, 2005 plaintiff filed an amended complaint. On November 15, 2005 defendants filed their answer to the amended complaint. On January 18, 2006 I issued a memorandum opinion and order granting in part and denying in part defendants' motion to dismiss. On February 15, 2006 plaintiff filed a second amended complaint in order to address certain issues raised in my opinion. On March 10, 2006 defendants filed their answer to the second amended complaint. On April 28, 2006 defendants asked plaintiff to consent to the filing of an amended answer. Plaintiff refused to consent. Accordingly, on June 9, 2006 defendants filed the present motion.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 13(f), a district court may grant a party leave to set up a counterclaim

by amendment when that party fails to do so in its original

pleading "through oversight, inadvertence, or excusable neglect,

or when justice requires . . ." Since the omitted counterclaim

must be added by amendment, Rule 13(f) must be read together with

Federal Rule of Civil Procedure 15(a), *Banco Para el Comercio v.*

*First Nat'l. City Bank,* 744 F.2d 237, 243 (2d Cir. 1984), which

directs that leave to amend a pleading "shall be freely given

when justice so requires." The decision whether to permit or

disallow amendment of a pleading is within the district court's

discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401

U.S. 321 (1971). Although leave to amend is not automatic, "only

'undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party ···

[or] futility of the amendment' will serve to prevent an

amendment prior to trial." *Sterling v. Interlake Indus. Inc.,* 154

F.R.D. 579, 588-89 (E.D.N.Y. 1994) (quoting *Foman v. Davis,* 371

U.S. 178, 182 (1962)); *see also Barrows v. Forest Labs., Inc.,*

742 F.2d 54, 58 (2d Cir. 1984). In addition, on a motion to amend

an answer to assert counterclaims, the Court should take into

consideration whether the proposed counterclaims are compulsory.

*Northwestern Nat. Ins. Co. of Milwaukee, Wisconsin v. Alberts,*

717 F.Supp. 148, 153 (S.D.N.Y. 1989).

    Defendants have moved to amend their answer to include

counterclaims for fraudulent inducement, breach of contract, and fraud.[2] Plaintiff argues that defendants should not be allowed to amend because (1) their motion is untimely and made in bad faith, (2) the addition of counterclaims would require further discovery, and (3) the counterclaims are meritless.

Plaintiff argues that defendants' motion is untimely because it was made a year and a half after the original complaint was served.[3] Plaintiff contends that since defendants have already filed three answers, and they have already had several opportunities to assert their counterclaims. Pointing to *Starter Corp. v. Converse, Inc.,* 1996 WL 684165, *2 (S.D.N.Y. 1996), plaintiff argues that "[t]he burden is on the party who wishes to amend to provide a satisfactory explanation for the delay." Since defendants have offered no reason for the delay, plaintiff argues that their motion should be denied. However, while the *Starter Corp.* court did take into account the fact that defendants had provided no explanation for delay as one factor weighing against amendment, the court also relied on the fact that the case was proceeding on an expedited trial schedule which allowed for only

---

[2] Defendants' proposed amended answer contains a counterclaim for unconscionability. However, defendants now state that they do not wish to pursue that claim.

[3] Defendants note that they have waited only three months to bring this motion since they filed their most recent answer. However, since the original complaint contained allegations about the factual circumstances which give rise to the counterclaims, and defendants could have brought the counterclaims at that point, the relevant time period is a year and half.

four months between the filing of the answer and the trial date.

Recognizing that, "delays of several years are considered

insufficient to warrant the denial of a motion to amend," *Id.* at

*3, the court found that because of the trial posture of the case

before it, even a shorter delay was unreasonable.  Moreover, the

court found that because of the proximity of the trial date, the

plaintiff would be prejudiced by what constituted in the

circumstances a last minute amendment. In the present case no

trial schedule has yet been established, discovery is still

ongoing, and the amount of time for which the case has been

pending, a year a half,[4] is unfortunately, not unusual in this

District.  Although defendants have not explained their delay,

Rule 13(f) permits amendment even where a party has no

justification for failing to assert the counterclaims but failed

to do so only through "oversight" or "inadvertence." Accordingly,

considering the rule in this Circuit that "the lateness of a

motion to amend [alone] is not a proper basis for denying the

application," *Golden Trade, S.r.L. v. Jordache*, 143 F.R.D. 504,

506 (S.D.N.Y. 1992)(citing *Richardson Greenshields Sec., Inc. v.

Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987), and the fact that

defendants' counterclaims are compulsory I will not deny

---

[4] Moreover, since the plaintiff twice amended its complaint, most
recently on February 15, 2006, much of the delay can be attributed to the
plaintiff's amendments. It would be unfair after plaintiff's numerous
amendments and their resulting delay to use that delay to prohibit defendants
from making their first amendment.

defendants' motion on this ground.

Plaintiff also argues that defendants' counterclaims are being asserted in bad faith to delay the resolution of this matter. Plaintiff argues that the defendants' bad faith is evidenced by the fact that there are eleven docket entries regarding discovery. However, an examination of the docket suggests that these were, for the most part, simply routine minute entries by the Magistrate Judge concerning the scheduling and management of discovery. Without further elaboration or evidence concerning the content of the meetings before the Magistrate, the listing of eleven docket entries concerning discovery over the course of more than a year is insufficient to demonstrate that defendants' request for permission to amend their answer is part of a broader scheme to delay resolution of this matter.

Plaintiff also argues that defendants are proceeding in bad faith because "there is an open question whether defendant M2 Technologies, Inc. [the defendant on behalf of whom the counterclaims are asserted] even exists." Cohen Aff. ¶17.[5]

_____

[5] Plaintiff points to the deposition testimony of two of the individual defendants, Brown and Sartorio. Defendant Brown testified that "he did not know" if M2 was an actual corporation, Brown Dep. 26-31 and Sartorio testified that he had no connection to M2 and did not know if it even existed. Sartorio Dep. 34-35, 31-42, 96-97. Since these individual defendants are being sued on account of their connection to M2 Technologies it is not surprising that they have attempted to distance themselves from M2, even going so far as to claim that they did not know if it existed. This is not dispositive on the issue of whether or not the corporation does in fact exist.

However, since, as plaintiff concedes, the question is an open
one, the defendants are free to assert that M2 Technologies does
exist and therefore are free to bring a counterclaim on its
behalf. The mere fact that the plaintiff disputes whether M2
Technologies exists is insufficient to demonstrate that
defendants' contention that M2 does exist constitutes bad faith.

Plaintiff next argues that even if the counterclaims are not
untimely or made in bad faith, that the addition of the proposed
counterclaims would unduly prejudice plaintiff. The party
opposing the motion for leave has the burden of establishing that
an amendment would be prejudicial. *Sterling*, 154 F.R.D. at 589.
"In determining whether an amendment would cause prejudice, [a
court should] consider whether the assertion of the new claim or
defense would (I) require the opponent to expend significant
additional resources to conduct discovery and prepare for trial;
[or] (ii) significantly delay the resolution of the dispute."
*Marsh v. Sheriff of Cayuga County*, 36 Fed.Appx. 10, 11 (2d Cir.
2002)(citations omitted). Prejudice from granting a motion to
amend is generally found in cases in which "[t]he motion comes on
the eve of trial after many months or years of pre-trial
activity; the amendment would cause undue delay in the final
disposition of the case; the amendment brings entirely new and
separate claims, adds new parties or at least entails more than
an alternate claim or a change in the allegations of a complaint.

*Minoli v. Evon*, 1996 WL 288473 (E.D.N.Y. 1996)(quoting *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp., 68 F.R.D. 383, 385 (N.D.Ill. 1975)).*

Plaintiff recently requested and obtained an extension of the discovery deadline until September 29, 2006 so that it could re-depose defendants Monteleone, Brown and Sartorio. Accordingly, to the extent the further questioning of these defendants will be necessitated by the amendment, plaintiff will be able to add questions to the already planned depositions. Even if allowing defendants to assert their counterclaims will necessitate extension of the discovery deadline, the counterclaims sufficiently encompass issues raised by defendants' previously asserted affirmative defenses and arise out of the same set of transactions and occurrences already raised in this action such that an extension will not be unduly prejudicial. *See American Elec. Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435 (S.D.N.Y. 1976) (no prejudice existed where factual showing necessary to support additional claims arises out of the same transaction and occurrences that were the subject of the underlying claim); *see also Hanlin v. Mitchelson,* 794 F.2d 834, 841 (2d Cir.1986) (amended claims allowed where they were "merely variations on the original theme" and arose "from the same set of operative facts"). In addition, although the case was commenced a little over a year ago, it has not progressed to the point that

defendants' proposed counterclaims are being raised on the eve of trial or will subvert an otherwise imminent disposition of the case. Accordingly, plaintiff will not be prejudiced by allowing defendants to assert their counterclaims.

Plaintiff also argues that the amendments must not be permitted because they are futile. A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6). *Martin v. Dickson*, 100 Fed.Appx. 14, 16 (2d Cir. 2004).

Defendants' proposed counterclaim for fraudulent misrepresentation alleges that in order to induce defendants to enter into the agreement the plaintiff falsely stated that "the hazardous waste would be carted away by Care for disposal in liquid form" and that "the costs associated with the work performed by Care under the Agreement would be keeping with costs in [the] proposal presented to Care prior to the execution of the Agreement." Proposed Answer to Second Amended Complaint ¶¶111, 113.

To establish a fraudulent misrepresentation claim in New York, a party must show, "(1) that [the defendant] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [the defendant] (5) that was made for the purpose of inducing [the plaintiff] to rely on it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of

its falsity (8) to his injury." *Sultan v. Read*, 2005 WL 486732,
*3 (S.D.N.Y. 2005)(quoting *Cohen v. Koenig,* 25 F.3d 1168, 1172
(2d Cir. 1994). However, when a party alleges both a fraudulent
misrepresentation claim and a breach of contract claim, as the
defendants have done here, it "must distinguish between the two
claims by (1) demonstrating a legal duty separate from the duty
to perform under the contract, (2) establishing a fraudulent
misrepresentation collateral or extraneous to the contract; or
(3) seeking special damages cause by the misrepresentation and
unrecoverable as contract damages. *Sultan*, 2005 WL 486732 at *3
(citing *Bridgestone/Firestone v. Recovery Credit Servs., Inc.,* 98
F.3d 12, 20 (2d Cir. 1996)). Defendants have not demonstrated any
of these factors. "Simply dressing up a breach of contract claim
by further alleging that the promisor had no intention, at the
time of the contract's making, to perform its obligations
therunder, is insufficient to state an independent tort claim."
*Telecom International*, 280 F. 3d at 175 (quoting *Best Western
Int'l v. Crown Sanitation Int'l Corp.*, 1994 WL 465905 *4
(S.D.N.Y. 1994). Accordingly, defendants have failed to state a
cause of action for fraudulent misrepresentation and the motion
for leave to amend to assert such a claim is denied.

Defendants also allege a counterclaim for breach of
contract. Plaintiff argues that because to prove a breach of
contract under New York law a party must show that, "(1) a

contract existed between the parties; (2) the plaintiff has in all respects complied with its obligations; (3) defendants' alleged failure constitutes a failure to perform its obligation under the contract; and (4) plaintiff has been damaged as a result of the defendants' actions, *Weiss v. La Suisse, Societe D'Assurances Dur La Vie,* 226 F.R.D. 446 (S.D.N.Y)(citations omitted), and because defendants have conceded that they failed to comply with their obligations under the contract by failing to pay plaintiff within 30 days of each invoice, that defendants cannot assert a breach of contract claim. However, it is well established that where one party materially breaches a contract the other side is excused from its performance. *Bernard v. Las Americas Communications*, 84 F.3d 103, 108 (2d Cir. 1996). Since defendants allege that plaintiff materially breached the contract and that defendants' failure to perform was excused by the material breach, defendants may assert a breach of contract claim.

Defendants' last counterclaim asserts that plaintiff fraudulently performed under the contract to obtain excessive profits by inflating the cost of the services. Plaintiff argues that the claim is meritless because it violates the well-settled principle of New York law that "a party cannot maintain a fraud claim if the alleged fraud is merely the breach of a contract." *Arista Technologies, Inc. v. Arthur D. Litte Enterprises, Inc.*,

125 F.Supp.2d 641, 654 (E.D.N.Y. 2000)(citations omitted). In the present case the third counterclaim (the breach of contract claim) alleges that plaintiff failed to provide the necessary waste removal equipment, thus breaching the agreement and forcing defendants to incur unnecessary expenses associated with the completion of the work. The counterclaim at issue here alleges that "[i]n performing its work under the Agreement Care failed to arrange for suitable equipment and supplies to be present at the work site for the purpose of delaying Care's work and inflating the cost of its services." Proposed Answer to Second Amended Complaint. ¶131. Thus, this counterclaim merely alleges that the breach of contract alleged in the third counterclaim also constituted fraud. Accordingly, this counterclaim fails to state a separate cause of action and leave to amend to assert this claim is also denied.

CONCLUSION

For the reasons set forth above defendants' motion for leave to amend its answer is granted in part and denied in part.

The Clerk is directed to transmit a filed copy of the within to the parties and the Magistrate Judge.

SO ORDERED.

Dated : Brooklyn, New York
          August 7, 2006


                    /s/ Charles P. Sifton (electronically signed)
                    United States District Judge